EXCELSIOR FOUNDRY CO. *v.* WESTERN ASSURANCE CO.

FIRE INSURANCE—CONDITIONS—CHANGE OF INTEREST.

> A fire policy was issued on factory buildings erected on land held by the insured under a part-paid contract from W. Subsequently the insured contracted to sell the plant to W. and reassign the contract. The contract was reassigned, half the consideration paid to the insured, and a bill of sale of the plant delivered to a third person, to be delivered to W. on

full payment; it being agreed that title was not to pass until then., Before delivery of the bill of sale, a fire occurred. *Held*, that the policy was avoided, under a provision therein making it void in case of any change, other than by the death of the insured, in the interest, title, or possession of the subject of insurance.

Error to Bay; Shepard, J. Submitted October 21, 1903. (Docket No. 54.)   Decided January 26, 1904.

*Assumpsit* by the Excelsior Foundry Company against the Western Assurance Company on a policy of insurance. From a judgment for defendant on verdict directed by the court, plaintiff brings error.   Affirmed.

*T. A. E. & J. C. Weadock,* for appellant.

*Chamberlain & Guise (M. L. Courtright,* of counsel), for appellee.

MOORE, C. J.   This is a suit to recover an insurance loss.   The circuit judge directed a verdict in favor of defendant.   The plaintiff brings the case here by writ of error.

It is conceded that, if anything is due plaintiff, it is the sum of $870 and interest.   The insurance policy contains a provision that the policy shall be void '' if any change, other than by the death of an insured, take place in the interest, title, or possession of the subject of insurance,'' etc. The sole question is whether, after the policy was obtained, there was such a change in the interest of the insured in the property at the time of the fire as to relieve the defendant from liability.   There is not much dispute about the facts.   When the policy was obtained, the land on which the buildings stood was held by plaintiff under a part-paid land contract from Frank W. Wheeler.   Mr. Wheeler entered into negotiations for the purchase of plaintiff's plant, resulting in the making of the following paper:

'' *Know all men by these presents*, that at a regular meeting of the stockholders of the Excelsior Foundry

Company, held at West Bay City, Michigan, on the 12th day of June, 1899, the following resolution was unanimously adopted by the stockholders of this company, to wit:

" '*Resolved*, that the directors of this company be, and they are hereby, authorized and directed to sell and convey all of the property, including the plant, machinery, tools, etc., belonging to this company, by bill of sale and other instruments of conveyance, and to assign the contract for the purchase of block four of F. W. Wheeler & Co.'s Second Addition to West Bay City, thus conveying all of the assets of this company, excepting its bills and accounts receivable and certain stock and materials on hand, at and for the sum of $20,000.00.'

"*And whereas*, subsequently, and on the same day, at a meeting of the directors of said company, duly called, the following resolution was unanimously adopted:

" '*Resolved*, that this company accept the proposal of Mr. Frank W. Wheeler to purchase its plant, and all of its tools, machinery, and appliances, and take a reassignment to him, or his nominee, of its contract for the purchase of block four, F. W. Wheeler & Co.'s Second Addition to West Bay City, being all of its assets, excepting bills and accounts receivable and its stock of merchandise, which stock was not inventoried, all of such property to be sold to Frank W. Wheeler, or his nominee, for the sum of $20,000.00.'

"*Now, therefore*, in consideration of the premises, and of the sum of twenty thousand dollars ($20,000.00), to it in hand paid by Frank W. Wheeler, the receipt of which is hereby confessed and acknowledged, and in pursuance of the resolutions of the shareholders and directors of this company, the Excelsior Foundry Company does hereby sell, assign, transfer, and set over unto the said Frank W. Wheeler all of the following property, to wit: The buildings occupied by it, and situated in block four of F. W. Wheeler & Co.'s Second Addition to West Bay City; all machinery, tools, and appliances of every kind, name, and description now in said buildings; the contract interest from F. W. Wheeler & Co. of said block four; and all shop rights and other rights and licenses belonging to it, and all other property of every name, kind, and description belonging to this company, excepting bills and accounts receivable, account-books, and all stock or merchandise now in and about said premises, consisting of pig and scrap iron and coke, etc.; it being the intention of this bill

of sale to convey to said grantee all of the property of this company whatever, except such as was not shown on the inventory furnished Messrs. Punt and Logan on June 3d, 1899.

"The Excelsior Foundry Company covenants and agrees it has a good, perfect, and unincumbered title to said assets hereby conveyed, and that the same are free and clear from any liens or incumbrances whatsoever, and that it will warrant and defend the same against all lawful claims whatsoever.

"In witness whereof, the said company has hereunto set its corporate seal, and its hand, by the hand and seal of its vice-president and secretary, who are duly authorized to execute the same by virtue of said resolutions.

"The EXCELSIOR FOUNDRY CO.,
"By CHARLES T. WILKES, Vice-Pres.    [L. S.]
[Seal.]        "W. H. LE FEVRE, Secty.    [L. S.]
"Signed, sealed, and delivered in presence of
"WILLIAM BURNETT.
"W. C. PENOYER."

The secretary of the company testified that on the 16th of June, 1899, this bill of sale was delivered to Mr. Wheeler, and he received for the company a check of $10,000, and Mr. Wheeler's three-months note for $10,000, secured by an equal amount of stock as collateral. The following entries were made in the journal of plaintiff company:

"1899, June 16th.    Shipyard trust deal, by F. W. Wheeler's three-months note, at 6 per cent., to be secured by equal amount of American Shipbuilding's preferred stock as collateral, the same being in full for foundry plant."

"Q. Will you turn to the item that treats of the cash that was received?

"A. Same date: 'Ship trust deal, F. W. Wheeler and James Hoyt, on account of sale of foundry plant, $10,000.'"

He further testified that he was instructed to take the bill of sale to Detroit, and, upon payment of the consideration in full, to deliver it to the necessary parties. At the time this bill of sale was made, the land contract held by

the plaintiff from Mr. Wheeler was reassigned to him. Mr. Wheeler made a warranty deed of property which included the land mentioned in the land contract to the West Bay City Shipbuilding Company. This deed was dated June 14, 1899, and was put upon record June 17, 1899. The $10,000 note was paid to the plaintiff company July 28, 1899. The secretary afterwards modified his statement so as to say the bill of sale was handed to Mr. Wheeler, and then to Mr. Hoyt, to be by him delivered to Mr. Wheeler when the note was paid, and that the title was not to pass until the note was paid. The record shows that $20,000 was all the property was worth.

Mr. Hoyt testified:

"Mr. Le Fevre wanted to know whether or not he would be assured in the possession of his foundry, so that he could carry out his contract that he had for the construction of a vessel that was then in process of construction at the yard, and which, under the terms of Mr. Wheeler's arrangement with us, Mr. Wheeler himself was to complete. The bill of sale was then shown me by Mr. Le Fevre, and Mr. Le Fevre then took me to one side, and stated to me the fact about the uncompleted contract, which he did not expect to get through until August 1st, and also stated to me that only one-half of the purchase price was paid in cash that day, and a note was given for the balance; and he intimated that he wanted to be sure he was going to get his money, and he wanted to be sure he was going to have possession of his foundry in order to complete his contract. I told him at once that I would take the bill of sale, and that it should not be delivered to Mr. Wheeler at all; that it would be delivered to me, as the representative of Mr. Le Fevre; that I would hold it; that I would not deliver the bill of sale to Mr. Wheeler until Mr. Wheeler's note was paid, and until Mr. Le Fevre had been left in possession of these premises until he could complete his contract. I said: 'If you can trust me, it will be entirely safe. I will not make that delivery. I will hold the bill of sale. Mr. Wheeler shall not have it at all. I will keep it.' Mr. Le Fevre immediately said he was satisfied. I took the bill of sale, put it in my pocket, and this is the original bill of sale, and I have had it ever since."

—And that it was understood the title should not pass until the delivery of the bill of sale. Mr. Wheeler testified substantially to the same thing. The fire occurred July 8, 1899.

It is said that, in construing an insurance contract, when doubt arises, that construction most favorable to the insured should be applied. Counsel say:

"A provision in a policy forfeiting same in case of sale or transfer must be strictly construed against the company. *Kempton* v. *Insurance Co.*, 62 Iowa, 83 (17 N. W. 194). The same rule applies to a provision for forfeiture in case of change of interest, title, or possession. *Erb* v. *Insurance Co.*, 98 Iowa, 606 (67 N. W. 583, 40 L. R. A. 845); *Arkansas Fire-Ins. Co.* v. *Wilson*, 67 Ark. 553 (55 S. W. 933, 48 L. R. A. 512, 77 Am. St. Rep. 129), The title, by the agreement of the parties, remained in the plaintiff. There was an agreement to sell, and a payment on account. By an understanding of the parties, no title was to pass until the last penny of payment had been made, and until plaintiff should have completed a certain construction contract. On the question of change of title, the test usually applied by courts is whether or not the vendee under the contract could have enforced a specific performance. Ostrander, Fire Ins. § 65, and cases cited."

They also cite many other cases.

The cases, as a rule, do not aid in reaching a conclusion in this case, because the conditions in the policy are not the same, or the facts are not the same. In a note to *Morrison's Adm'r* v. *Insurance Co.*, 59 Am. Dec., at page 306 (s. c., 18 Mo. 262), there is a classification of the clauses in insurance policies in restraint of alienation. The second class of policies mentioned are those containing a clause restricting a transfer, change, or termination of the interest of the insured in the property insured. At page 308 it is said of this class that the generally accepted interpretation is that the whole interest of the insured must pass, and while an insurable interest remains he may recover. To the same effect is the opinion in *Grable* v. *Insurance Co.*, 32 Neb. 645 (49 N. W. 713).

There are many cases which hold a contrary doctrine.

In *Gibb* v. *Insurance Co.*, 59 Minn. 267 (61 N. W. 137, 50 Am. St. Rep. 405), the language of the policy is, word for word, the same as in the policy in this case. The policy of insurance was issued February 29, 1892. The insured gave a land contract March 23, 1892, agreeing, upon the payment of $2,500, to convey by warranty deed the property. Three hundred dollars was paid down, and $50 every 60 days thereafter. The fire occurred February 28, 1893. The plaintiff claimed that, as he was the owner of the legal title, he could recover. In disposing of the case, the court said:

"It is contended by appellant that, by the transactions with Kelly, there took place a change in the interest, title, and possession of Gibb, and the condition against any such change was broken, and the policy avoided as to him. It seems to us that there was a breach in the condition against any change of interest. It is not claimed by respondents that there was any waiver of this condition, and the authorities cited by counsel are nearly all cases where the breach claimed was not of a condition against a change of interest, but a change of title. It is held by the great weight of authority that, where the condition is against any change in the title, there is no breach unless there is a change in the legal title; that, as long as the insured retains the legal title and an insurable interest in the premises, the policy is not avoided by a transfer of the equitable title or of equitable interests. But we cannot apply this doctrine to a condition against any change of interest. The terms are not synonymous, as contended by counsel. The word 'interest' is broader than the word 'title,' and includes both legal and equitable rights. It is not necessary to consider the question of the change of possession, except so far as it has an influence on the change of interest by strengthening and fortifying the interest acquired by Kelly. This disposes of the case."

In the case of *William Skinner & Sons' Shipbuilding Co.* v. *Houghton,* 92 Md. 68 (48 Atl. 85, 84 Am. St. Rep. 485), the case of *Gibb* v. *Insurance Co., supra,* is cited with approval. A similar clause in a policy is also construed in the same way in the case of *East Texas Fire-Ins. Co.* v. *Clarke,* 79 Tex. 24 (15 S. W. 166, 11 L.

R. A. 293). See, also, *Fire Ass'n of Philadelphia* v. *Flournoy*, 84 Tex. 632 (19 S. W. 793, 31 Am. St. Rep. 89); *Germond* v. *Insurance Co.*, 2 Hun, 540; *Southern Cotton-Oil Co.* v. *Fire Ass'n*, 78 Hun, 373 (29 N. Y. Supp. 128).

In Ostrander, Fire Ins. (2d Ed.) at page 245 (§ 77), it is said:

"Where the policy provides that it will become void whenever any change takes place in the title, interest, or possession of the property insured, it is not necessary, to create a forfeiture, that an actual sale should be made. A change of interest or possession will often occur while the legal title will continue unchanged. The underwriter is alone concerned in the protection of the property, and these provisions of the insurance contract have no other purpose than to secure guaranties of good faith on the part of the insured. When a risk is accepted, it may be fairly presumed that the company taking the hazard has ascertained and considered carefully all important facts and circumstances affecting its character, and is satisfied to undertake the venture; but, to prevent anything from being concealed that ought to be disclosed, the validity of the policy is made contingent on a full and truthful expression of certain facts, which the policy specially mentions, and which the company deems material for its understanding of the risk, and for a basis of its judgment in regard to whether it should be accepted or declined. The character of the hazard being established to the satisfaction of the insurer, its next concern is that no material change shall take place without its consent, and this, too, is provided for by the terms of the policy. The insurer cannot watch its many ventures. They are often remote and widely scattered, and besides, too, the greatest dangers that menace property are those that are frequently hidden from public scrutiny. The only practicable plan, therefore, of preserving the *status* of the risk, is to make the validity of the policy depend upon the insurer being informed of any material changes made, and its consent obtained. In most cases the insured is constantly apprised of the situation of his property, while the company which has assumed the whole responsibility in case of loss has its office in a distant city, and is entirely without the means of information. The necessities of the case are apparent,

and the requirements contained in the policy in regard to notice and consent are reasonable, and will be enforced by the courts with strictness. Mankind has not yet so far advanced in morals as to be no longer governed by motives that arise from considerations of personal interest. This fact is too well understood to need stating. It is recognized by all, and no business undertakings will succeed that are not based upon this underlying principle of human conduct. The underwriter acknowledges his belief in this general infirmity of the race by the careful provision he makes to guard against any motive for the destruction of the property he insures. He has learned in the lessons of experience that the chances of loss are increased in proportion as the interest of the holder of his policy is diminished. The supreme court of Iowa, in discussing this matter in connection with title, very properly said:

" ' The object of the insurance company by this clause is that the interest shall not change, so that the insured shall have a greater temptation or motive to burn the property, or less interest and watchfulness in guarding and preserving it from destruction by fire. Any change in or transfer of the interest of the insured in the property, of a nature calculated to have this effect, is in violation of the policy; but if the real ownership remains the same,—if there is no change in the fact of title, but only in the evidence of it, and if this latter change is merely nominal, and not of a nature calculated to increase the motive to burn, or diminish the motive to guard the property from loss by fire,—the policy is not violated.' *Ayres* v. *Insurance Co.*, 17 Iowa, 176."

While there is some conflict in the authorities, we think the weight of authority is that, under a policy like the Michigan standard policy, any material change in the interest of the insured in the property insured will avoid the policy. In this case the contract for the premises upon which the buildings were was reassigned to Mr. Wheeler. The insured had been paid $10,000 in cash, and had a note for the balance of the purchase price, secured by a large block of valuable stock, and the note itself was paid within 20 days after the fire. The circuit judge was right in holding there had been such a material change in the interest of the insured as to avoid the policy.

Judgment is affirmed.

The other Justices concurred.