KAMM & SCHELLINGER BREWING CO. *v.* ST. JOSEPH
COUNTY VILLAGE FIRE INSURANCE CO.

1. INSURANCE — MUTUAL POLICY — FIRE INSURANCE — ASSIGNMENT
OF POLICY — CONSENT OF INSURER TO TRANSFER — CHANGE IN
TITLE—NOTICE.

Under provisions of the charter of a mutual fire insurance cor-
poration, permitting insured to assign his policy only upon
the written consent of the secretary indorsed thereon, and
terminating the insurance upon sale or transfer of property
insured, the purchaser of insured premises, who gave no no-
tice to the insurer, and did not obtain the written consent
of its secretary to the assignment, could not recover on the
ground that defendant's collector, one of its directors, knew
of the sale and assignment, and received payments from the
agent of plaintiff, the assignee.

2. SAME.

There being no privity or mutuality of contract between plain-
tiff and defendant so as to render plaintiff liable to the other
members of the mutual company for plaintiff's proportion of
their losses, plaintiff, as assignee of such policy, obtained no
rights as against the insuring corporation.

3. SAME — PRINCIPAL AND AGENT — OFFICERS OF CORPORATION —
CORPORATE DIRECTORS OR AGENTS—WAIVER.

Agents and officers of mutual fire insurance companies, in
which the charter and by-laws determine the rights of mem-
bers, have less authority than those of stock companies in
creating a waiver of conditions contained in contracts: offi-
cers have no power to bind their companies by other incon-
sistent contracts or provisions.

4. SAME — MUTUALITY OF PARTICIPATION IN CORPORATE AFFAIRS.

The principle which lies at the foundation of mutual insur-
ance, and gives it the name, is mutuality; in other words the
intervention of each person insured in the management of
the affairs of the company and in the profits and losses of the
business in proportion to his interest.

5. SAME—CHANGE IN OWNERSHIP.

In order to apprise the insurer of material changes in the risk,
provisions requiring notice of transfers, change of title, etc.,
are reasonable and enforceable.

6. Same—Estoppel.

> And where, after a transfer of insured premises, the assignee of the policy, knowing that assessments were made to the assignor, paid such assessments without securing the required consent of defendant to the assignment, such transferee could not recover, although the collector who received the payment was a director of defendant and had knowledge of the change in title.

Error to St. Joseph; Yaple, J. Submitted December 11, 1911. (Docket No. 196.) Decided March 12, 1912.

Assumpsit by the Kamm & Schellinger Brewing Company against the St. Joseph County Village Fire Insurance Company on a policy of insurance. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*F. W. Knowlen* and *M. L. Howell* (*J. M. Harvey, Jr.*, of counsel), for appellant.

*R. R. Pealer* and *George E. Miller* (*H. P. Stewart*, of counsel), for appellee.

Stone, J. This is an action on a fire insurance policy. The plaintiff is, and since March, 1887, has been, a corporation organized and existing under the laws of Indiana, the business of which corporation is described in its articles to be the manufacture and sale of beer and malt, to be carried on in the town of Mishawaka, St. Joseph county, Ind. On the 25th day of April, 1905, the plaintiff bought by warranty deed from Mary Withers, the then owner, a lot, including the business building thereon, situate in the village of Constantine, St. Joseph county, Mich. At the time of this purchase the said premises were, and for several years theretofore had been, occupied by William E. Withers, husband and tenant of said Mary Withers, as a saloon. From and after said purchase in 1905, and until the fire hereinafter mentioned, said William E. Withers continued to occupy said premises for a saloon under a lease to him from the plaintiff. Such lease

bears date March 6, 1905, and contained the following clause:

"It is understood and agreed by and between the parties hereto that second party while occupying said saloon under this lease shall use the Kamm & Schellinger keg beer exclusively, and also handle bottle beer of said Kamm & Schellinger, and give same the preference in sales of bottle beer. Second party to have the privilege of using the ice in the ice-house on said premises, and agrees and undertakes to replace all ice so used, and to refill said ice-house before May 1, 1906."

The defendant at the time of said fire was, and for about 20 years theretofore had been, a mutual fire insurance company, organized and existing under chapter 132, 1 How. Stat. (2 Comp. Laws, § 7266 *et seq.*), and the amendments thereto. By its charter it was authorized to insure business and residence buildings in St. Joseph county, Mich. By said charter the general management and control of said insurance company was vested in the board of directors, consisting of the president, secretary, treasurer, and six directors. Specifically, said board of directors had authority to adopt by-laws, assess members, adjust losses, classify property, make rates, cancel policies, and audit claims against the company. Said charter also provided for a notice of loss to the secretary, or one of the directors, and for the meeting of the board of directors to adjust the loss. By said charter the board of directors directs the secretary to make an assessment roll to meet losses and expenses for the preceding year; and upon approval by said board of such roll they certify the same to the treasurer, directing him to collect the same. Upon receiving such certified roll, it is made the duty of the treasurer to immediately serve a notice upon each and every member of the company, which notice snall contain a statement showing the total amount insured by the company, the amount of loss, and name of person sustaining the loss in each case for which the assessment is made, the amount of expenses, the amount of assessment on each $1,000 in

the base class, the amount of his or her assessment, and a demand for the immediate payment of the same; also the name of the person to whom payment shall be made. Article 26 of said charter reads as follows:

" The insurance of any member shall cease upon the sale or transfer of the title of property insured, but such member shall be liable for all assessments upon such property, and for his or her equitable share of all losses and expenses incurred by the company, until his or her policy shall be surrendered or canceled.   Provided, that upon the sale of any property insured by this company the vendor may assign his or her policy to the purchaser, but such assignment of policy shall not be valid as against this company without the written consent of the secretary indorsed on the policy."

Article 27:

" Any member may withdraw from this company at any time upon surrendering his or her policy to the secretary and the payment of his or her equitable share of all losses and expenses incurred by the company up to the time the policy shall be surrendered."

By the by-laws of defendant company a schedule of classification of risks was provided, by which 12 classes were established; class No. 3 being the base class.

As the circuit judge directed a verdict for the defendant, the plaintiff is entitled to the most favorable view which can be taken of the evidence produced upon the trial.   James A. Marsh, a witness for defendant, who testified that he had been a director of defendant company since 1899, and a collector since 1894, testified as follows, on direct examination, as to the practice when the holder of a policy sold the insured property and assigned the policy to the purchaser:

"*Q.* Now, in answer to Mr. Howell's question in which he asked you whether you considered a person a member after an assignment, what have you to say about what is necessary to be done in order to be a member?   Now, when did you regard them as members?

"*A.* As soon as there was an assignment made, they

took the place of the member who had taken out that policy.

"*Q.* Well, before the approval of the secretary?

"*A.* Oh, no.

"*Q.* When the assignment was made and approved by the secretary?

"*A.* I always consider when the assignment is handed to me that that is just as good as the approval, because I then forward it to the secretary.

"*Q.* But there is no assignment ever handed to you?

"*A.* No.

"*Q.* No policy ever handed to you?

"*A.* No.

"*Q.* No application ever made to you?

"*A.* No, sir.

"*Q.* For approval of the assignment?

"*A.* No, sir.

"*Q.* What do you consider the assignment includes when you become a member?

"*A.* I consider that when a policy is assigned to a second person that second person becomes a member in place of the first person.

"*Q.* When?

"*A.* When presented to me or the company.

"*Q.* And approved?

"*A.* Yes, sir.

"*Q.* Have you ever been given any right to approve by any action of the board, to approve of the transfer by assignment of policies?

"*A.* No, sir. I don't approve them.

"*Q.* You don't approve them?

"*A.* No; I don't approve them myself, but consider that the company is binding when that assignment is handed to me, and I forward it to the company.

"*Q.* That is the way you consider it?

"*A.* The same as though I was taking an application.

"*Q.* But you never had any such authority given you by the company?

"*A.* No, sir.

"*Q.* Who approved all the assignments?

"*A.* Mr. Cross.

"*Q.* Who is he?

"*A.* The secretary of the company.

"*Q.* Where does he live?

"*A.* Centerville.

"*Q.* If you took an assignment—took a policy that had been assigned and sent it over to the secretary and he should refuse to approve of it—then when would you consider it was approved or disapproved ?

"*A.* I would consider it void from the time he would notify me—such things have been done."

Recross-examination:

"*Q.* Mr. Marsh, as I understand you, when the sale of the property was made down there, and the policy was assigned and you were given notice of it, the assigning of the policy was as you regarded it, and, as the company's practice was, the assignee of the policy was protected until the secretary disapproved of it ?

"*A.* When it was presented to me; yes, sir.

"*Q.* Yes; that is what I mean.

"*A.* Yes.

"*Q.* And approval on the policy was binding during the time from between the time of the presentation to you and the time of Mr. Green's notifying you that it was not approved ?

"*A.* I always so considered it; yes, sir.

"*Q.* That was the way—practically that is what you always did do ?

"*A.* Yes, sir.

"*Q.* So that if a man bought a piece of property that was insured in the company and the policy was assigned to him, and you were notified of it, he was considered as entitled to notice that it was not approved, or else he would hold the company ?

"*A.* Yes, sir."

Redirect examination:

"*Q.* When was that so ?

"*A.* What is that ?

"*Q.* When was that—when did you do that way ?

"*A.* I have always done that way.

"*Q.* Without the policy being presented ?

"*A.* Without the assignment being presented ?

"*Q.* Yes.

"*A.* Oh, no; I didn't mean to answer that I did that. I meant to answer that the assignment had been presented to me.

"*Q.* And the policy turned over to you and sent up to the secretary to be approved ?

"*A.* Oh, yes. The assignment is on the back of the policy.

"*Q.* In such a case?

"*A.* Then only.

"*Q.* Then only?

"*A.* Yes.

"*Q.* But not in the case where they were not presented at all?

"*A.* Oh, no.

"*Q.* They were delivered to you and sent up to the secretary?

"*A.* Yes, sir.

"*Q.* Now, from your practice whether it was only in such cases where presented to you to send up—delivered to you to send up to the secretary that you refer to?

"*A.* Certainly, we couldn't do anything without the policy.

"*Q.* That there may be no misunderstanding, I wish to ask you whether this policy and the assignment, purported assignment, was ever presented to you in any sort of way?

"*A.* The Withers' policy?

"*Q.* Yes.

"*A.* No; I never saw it."

Recross-examination:

"*Q.* Now suppose the man who made the assignment came in and told you he had made such an assignment, and had sent the policy on to Mr. Cross, that would be just the same, wouldn't it?

"*A.* No, sir. I wouldn't have anything to do with it.

"*Q.* I understand, but the giving of notice to you would be just the same wouldn't it?

"*A.* He has already sent it to Mr. Cross, and I hadn't anything to do with it.

"*Q.* I see. Now, then, was this policy ever delivered to you at any time before Kamm & Schellinger bought it?

"*A.* I don't think so. I think that policy was taken out before I was a member of the company—director of the company.

"*Q.* But it was assigned twice afterwards?

"*A.* Well, I don't think that I could recall it.

"*Q.* Take for instance the assignment of Withers to Mrs. Withers, did you regard this, when you were notified of it, if you were notified of it, and the policy was given to

you, as vesting—making Mary Withers a member of the company?

"*A*. I don't think I had anything to do with it, but I cannot recall it. It has been some time ago.

"*Q*. The policy was the property of William E. and Frank Withers, and it was assigned to Mary by W. E. Withers only?

"*A*. I have no recollection of that transaction at all.

"*Q*. And that was done in 1900?

"*A*. Well, that was before I had anything to do with it.

"*Q*. And you continued collecting right straight along, didn't you?

"*A*. I wasn't a director I think until about 1899, and I collected from about 1894.

"*Q*. This was done in 1900, which was after you became director.

"*A*. I haven't any recollection of it. Perhaps it was done there and sent by somebody.

"*Q*. And this was considered as protecting Mary Withers, although it wasn't assigned to her by both owners, wasn't it?

"*A*. I told you I don't know anything about it.

"*Q*. And for about five years she continued to pay premiums on it, didn't she?

"*A*. I told you that I knew nothing about that assignment. I don't think I ever had it in my hands. I don't remember of it, at least."

The policy in suit was issued by defendant to Joseph R. Watson on February 9, 1892, signed by Thomas Green, president, and Samuel Cross, secretary. On July 25, 1893, said policy was duly assigned by said Watson to William E. and Frank S. Withers, purchasers of insured property, and the secretary of defendant consented in writing thereto. On June 18, 1900, Mary Withers purchased said property, and on that day said policy was duly assigned to her, and the due consent of the secretary had thereto in writing. From this time until the sale of the insured property and transfer of said policy to the plaintiff, William E. Withers, husband of said Mary Withers, occupied the insured property as his saloon, and for his wife paid each year the assessments on the policy.

On April 25, 1905, Mary Withers sold and conveyed the insured property to the plaintiff, and duly assigned the policy to the plaintiff. The written consent of the secretary of the defendant company was neither asked nor obtained. The said James A. Marsh, whose testimony has been quoted above, for a number of years had been cashier of the Commercial State Bank of Constantine. Each year, from 1894 down to the time of the trial, the annual list of Constantine policy holders was sent to Marsh for collection, and the policy holders were severally notified by the treasurer to pay, and did pay, his or her assessment to said Marsh at said bank.

The notice to Mary Withers had for many years included the policy in suit, and also another policy covering a dwelling house property. The amount of this dwelling policy and its rate of assessment and amount thereof differed from the saloon risk in suit; the saloon building having been in class 7, and the residence property in class 2. The assessment upon the former was more than twice as high as on the latter. Marsh, the defendant company's collector and director, and cashier of the bank aforesaid, knew of the sale of the property in question by Mary Withers to the plaintiff. He advised the Withers people to sell to the plaintiff, and he knew that the consideration she received from plaintiff was $6,000. This money was paid by plaintiff's check to Mary Withers, which check was cashed by, and deposited with, said Marsh in his bank on the day of sale, and it continued on deposit for about two years; he having given Mary Withers certificates of deposit therefor.

The first annual assessment after the sale of the property, and the transfer of the policy by Mary Withers to the plaintiff, came in January, 1906. The notice of assessment upon the policy came to Mary Withers from the treasurer, and the notice directed her to pay the same to James A. Marsh at Commercial State Bank. William E. Withers, the tenant of plaintiff, went into the said bank and saw Marsh, and he asked Marsh how it came in his

wife's name after the transfer over to the plaintiff of the policy.   Marsh replied that it was just neglect.   He then paid Marsh for the plaintiff the amount of assessment on the policy in suit, amounting to $7.20.   The notice of assessment for 1906 came, as before, to Mary Withers, and William E. Withers again paid for plaintiff the amount of assessment upon the policy in suit to Marsh in March, 1907.   The third notice, namely, of the annual assessment for the year 1907, came again to Mary Withers in 1908; and before the expiration of the time given for its payment, but after the fire occurred, William E. Withers tendered to Marsh the amount of such assessment upon the policy in suit.   Marsh declined to receive it.   On January 19, 1908, a fire occurred in the building covered by the policy in suit, and serious damage followed.   On January 20, 1908, the board of directors met at the Commercial State Bank at Constantine to consider and adjust this loss.   The policy was presented to the board by the agent of the plaintiff.   The board denied all liability on the sole ground that the transfer of the policy to plaintiff from Mary Withers had not been approved in writing by the secretary.

At the trial it was admitted that the plaintiff, at the time of the commencement of this suit, had not paid any franchise fee or taken any steps under the laws of this State to be authorized to do business in Michigan.   At the conclusion of the testimony, defendant's counsel moved the court for a verdict for defendant by direction, for the reason that the plaintiff had not established any evidence of waiver of provisions of the policy, and had not shown its right to bring suit at all in that court.   The plaintiff presented certain requests to charge which it will not be necessary to set forth.   The trial judge directed the verdict for defendant, as requested, upon the grounds that there had been no written consent of the secretary to the assignment of the policy.   He advised the jury that that provision of the charter was a valid one, and that the assignee of the policy acquired no privity or contract rela-

tion with the defendant, unless such consent be obtained, or such provision waived; and he charged the jury that there had been no such waiver or estoppel as would warrant the submission of the case to them. He thereupon directed a verdict for defendant, and a judgment followed.

The plaintiff has brought the case here upon writ of error, and we shall find it necessary only to consider the sixth assignment of error—that the court erred in directing a verdict for the defendant. Although the circuit judge did not direct the verdict upon the ground that the plaintiff corporation had not complied with the laws of the State of Michigan, and therefore could not maintain suit upon the policy of insurance, nevertheless it is the contention of the defendant that this admitted fact is a bar to the action. By reference to the statute under which the defendant company was organized, and from the charter of the defendant, it appears that this company has no capital stock and was purely a mutual company, each policy holder being a member of the company, entitled to vote at the election of its officers and to take part in the transaction of its business. In other words, it is an organization of the property owners in a prescribed territory for the protection from loss by fire of the members of such organization. Each member contracts to be liable for the *pro rata* payment of all such losses, as well as to receive compensation for losses which he may sustain. Only the property of its members is insured. The members of the company under the charter consist of all persons holding policies of insurance and who subscribe their names to the copy of the charter and the by-laws of the company. Section 14 provides that every applicant for insurance shall sign his or her name to the application, to which a copy of the charter and by-laws of the company shall be attached, and, in case a policy shall be issued on such application, the said applicant shall thereby become a party to the contract for insurance, and be subject to all the conditions and provisions of the charter and by-laws of the company.

The plaintiff does not claim that it complied with the charter of the company, but says it took an assignment of the policy at the time it purchased the property covered by the policy, gave no notice of such assignment to the company, and did not in any manner comply with the provisions of section 26 of the charter above quoted, and never, in fact, either made application to become a member of it, or obtained the consent of the company to the assignment of the policy; but claims that its agent paid the assessments which the company made for losses, notice of such assessments having been given to Mary Withers. So we think the sole question that the plaintiff presents is whether or not its payment of such assessments, through its agent, to a director and collector of the company, under the circumstances above stated, amounted to a waiver of the provisions of the charter of the company rendering such policy void upon the sale of the property. Could the plaintiff by merely taking an assignment of the policy, without its contracting in any way to become responsible for any of the losses which other members of the company might sustain, claim in this action that such other members shall pay for losses which it sustains? If the plaintiff had taken its policy to the secretary of the company and had obtained consent to the assignment thereof, then it would have become a member of the company, and be liable for its *pro rata* share of all losses which the company sustained. It did not do this. It simply took the assignment of this policy, permitted the company to go along and treat Mrs. Withers as liable under the charter for her *pro rata* share of the assessments, and now claims that because of the statements to Mr. Marsh, and the payment by plaintiff's agent of the assessments against Mrs. Withers it is entitled to recover.

Let us look at this case for a moment from another point of view. Suppose, instead of plaintiff having had a fire loss, there had been a great conflagration and destruction of property owned by members of the company, such as occurred in some of the counties in this State re-

cently, and the defendant had undertaken to enforce liability against the plaintiff as a member of this company, would the plaintiff have been held to be a member of the company, and liable for such assessments? We think not, because the charter provides how persons may become members of the company. There was no contract relation whatever between this plaintiff and this company whereby this plaintiff became a member of it at all. The contract must be mutual, and the plaintiff must be equally liable for the losses of other members of the company before it can claim that the other members of the company shall be assessed to pay its losses. Members only are liable to assessment. 2 May on Insurance (4th Ed.), § 553, p. 1290. The rights of the parties are reciprocal.

In general, it may be said that the agents and officers of companies organized with a capital stock divided into shares have greater powers in determining what shall be the terms of the contract, and in waiving a compliance with its stipulations, than those of companies organized on the mutual principle, in which the charter and by-laws are made to fix and regulate every policy as to rights of the insurer and assured alike. Mutual insurance is essentially different from stock insurance, and much of the litigation that has grown out of this species of insurance has been owing to inattention to this difference. Its original design was to provide cheap insurance by means of local associations, the members of which should insure each other. Such associations are in their nature adapted only to local business. They need many by-laws and conditions that are not required in stock companies. And it is necessary and equitable that each person who gets insured in them should become subject to the same obligations towards his associates that he requires from them towards himself. When the company has once determined the forms in which its policies shall be made, and the conditions upon which it is willing to contract, it is nothing less than a violation of duty for the officers to undertake to bind the companies they represent by other or inconsist-

ent contracts, parol or otherwise.   Hence, where the by-laws of a company provide that subsequent insurance obtained, and subsequent alterations made, without the consent in writing of their president, shall avoid the policy, the verbal consent of the president is unauthorized.   Nor, when the by-laws require that the premium shall be paid before the policy shall take effect, has any officer the power to bind the company by an agreement that, notwithstanding the nonpayment of the premium, the policy shall be effective.   This rule is applicable only to by-laws which are of the essence of the contract.   1 May on Insurance (4th Ed.), § 146, and cases there cited.   19 Cyc. pp. 633, 634, 635:

"Most policies contain a provision that they are not assignable without the consent of the insurer, and they frequently provide the mode in which such consent shall be manifested.   Such provisions are valid and accomplish the purpose intended, so that the assignee acquires no privity with the insurer unless such consent be obtained. * * * If there is nothing in the policy giving consent in advance, a consent must actually be given at or subsequent to the time of the assignment to invest the assignee with rights against the insurer.   If a certain method for obtaining consent to an assignment of the policy is prescribed in the policy itself, no other mode will suffice. And a forfeiture takes place, if it be provided that such will be the effect of an assignment without the insurer's consent. * * * When the assignment has been completed and the consent of the insurer obtained, a new and independent contract has arisen by which the assignee acquires all the rights of the assignor"— citing numerous cases.

In *Excelsior Foundry Co.* v. *Assurance Co.*, 135 Mich. 474 (98 N. W. 11, 3 Am. & Eng. Ann. Cas. 707), Chief Justice Moore quotes with approval the following language from Ostrander on Fire Insurance (2d Ed.), at page 245, § 77:

"The character of the hazard being established to the satisfaction of the insurer, its next concern is that no material change shall take place without its consent; and

this, too, is provided for by the terms of the policy. The insurer cannot watch its many ventures. They are often remote and widely scattered, and besides, too, the greatest dangers that menace property are those that are frequently hidden from public scrutiny. The only practicable plan, therefore, of preserving the status of the risk, is to make the validity of the policy depend upon the insurer being informed of any material changes made, and its consent obtained. In most cases the insured is constantly apprised of the situation of his property, while the company which has assumed the whole responsibility in case of loss has its office in a distant city, and is entirely without the means of information. The necessities of the case are apparent, and the requirements contained in the policy in regard to notice and consent are reasonable, and will be enforced by the courts with strictness."

The principle which lies at the foundation of mutual insurance and gives it its name is mutuality; in other words, the intervention of each person insured in the management of the affairs of the company and the participation of each member in the profits and losses of the business in proportion to his interest. *Huber* v. *Martin*, 127 Wis. 412 (105 N. W. 1031, 1035, 3 L. R. A. [N. S.] 653, 115 Am. St. Rep. 1023, 7 Am. & Eng. Ann. Cas. 400).

It is contended by defendant's counsel that under the decisions in this State in the case of a policy of insurance issued by a stock company even, under the testimony in this case, the facts would not warrant the conclusion that the company had waived any of the provisions of the policy, and that they certainly would not constitute a waiver of the terms of a policy of a mutual insurance company like this—citing *Security Ins. Co.* v. *Fay*, 22 Mich. 467 (7 Am. Rep. 670); *New York Central Ins. Co.* v. *Watson*, 23 Mich. 486; *Reynolds* v. *Insurance Co.*, 36 Mich. 131; *Western Mass. Ins. Co.* v. *Riker*, 10 Mich. 279; *Cleaver* v. *Insurance Co.*, 65 Mich. 527 (32 N. W. 660, 8 Am. St. Rep. 908); *Robinson* v. *Fire Association*, 63 Mich. 90 (29 N. W. 521); *Allemania Fire Ins. Co.* v. *Hurd*, 37 Mich. 11 (26 Am. Rep. 491).

On the part of the plaintiff, it is claimed that what oc-

curred between Mr. Withers and Mr. Marsh amounted to a waiver by the company of the necessity of the written consent of the secretary to the assignment of the policy. Viewing the testimony in its strongest light against the defendant, we are unable to find any wavier or any conduct on the part of Marsh which misled, or in any manner deceived, the plaintiff, or any conduct to the prejudice of the plaintiff. The plaintiff's agent, with full knowledge of the fact that the assessment had been made against Mrs. Withers, saw fit to pay it. It was the duty of Mrs. Withers to pay the assessment until such time as she surrendered her policy for cancellation. The mere remark of Mr. Marsh that there had been neglect may have meant as well the neglect to surrender the policy on the part of Mrs. Withers, or the neglect of the plaintiff to do the necessary thing to make it a member of the defendant company, as any neglect of the defendant. In speaking of mutual fire insurance companies, this court well said in *Wardle* v. *Townsend*, 75 Mich. 392 (42 N. W. 952, 4 L. R. A. 511):

"The rights and obligations of the individual members are mutual, and each sustains a double relation to the corporation. As an assured he is entitled to be indemnified for his loss insured against by the corporation. As a member of the corporate body he, in consideration for this indemnity, agrees with the corporation, and with each member of the corporate body, to pay his just share or proportion of all losses, so that each member shall receive the same indemnity, and shall also pay his share of the expenses."

Parties taking insurance in a mutual company under a charter like that we are here considering, take it subject to the charter and by-laws of the society. Such a provision as section 26, providing that insurance shall cease upon the sale or transfer of the property insured, operates *ipso facto* to determine the connection between the society and the grantor, and to forfeit his rights as such member. And we know of no case in which the grantee can become a member except by compliance with the provis-

ions of the charter and by-laws. We are unable to find in this case that the plaintiff did anything to become a member of this company. It is not claimed that the policy was ever presented to Mr. Marsh. Had it been, another question would be before us.

Perhaps plaintiff did not desire to become such member, and incur the legal liabilities of such relation. Certainly the insurance ceased as to Mrs. Withers when she conveyed. Simply assigning the policy did not revive it. A further thing was necessary to be done, namely, to present the policy thus assigned to the secretary, make application to become a member of the company, and get the consent of the secretary indorsed thereon. Thereupon the assignee would have become a member of the company, and would have stood in the shoes of the original holder of the policy. The assessment was made against Mrs. Withers as it well might be made until the policy was surrendered and canceled; and mere payment of such assessment would not make the policy valid in the hands of the plaintiff, or constitute it a member of the company. There was no privity of contract between the plaintiff and the defendant, and the plaintiff cannot make a contract by estoppel based simply on its own neglect. The only waiver or estoppel that is claimed is that Mr. Marsh, the collector and one of the directors of the company, accepted payment of the assessment made against the grantor from William E. Withers, who says he was acting as agent of the plaintiff. We think the point is well made that Marsh neither as a director nor collector had power to bind the company by any conduct that would amount to a waiver. The charter nowhere gives to a single director any such power. The directors when convened as a board can act, and not otherwise. There is authority to the effect that members of the board cannot bind the company they represent, except in regular or special meetings of the board. Knowledge even of the agent or collector was not notice to the defendant company. His duties were to collect and remit assessments. *Larkin* v. *Modern Woodmen of*

*America*, 163 Mich. 670 (127 N. W. 786); *Brown* v. *Great Camp K. O. T. M. M.*, 167 Mich. 123 (132 N. W. 562); *Grand Lodge A. O. U. W. of Connecticut* v. *Burns* (Conn.), 80 Atl. 157.   In no view of the case which we are able to take was the plaintiff entitled to recover.   This renders it unnecessary for us to discuss the question whether or not the plaintiff had a standing in the courts of this State without having complied with the laws thereof, relating to foreign corporations doing business therein.

The judgment of the court below is affirmed.

MOORE, C. J., and STEERE and BROOKE, JJ., concurred.   OSTRANDER, J., concurred in the result.