## *In re* CERTIFIED QUESTION
### (FUN 'N SUN RV, INC v MICHIGAN)

Docket No. 99562. Argued November 1, 1994 (Calendar No. 1). Decided December 30, 1994. Certiorari denied by the Supreme Court of the United States on May 22, 1995, 514 US — (1995).

Fun 'N Sun RV, Inc., and John Chamberlain Corp., for themselves and on behalf of other policyholders of the Accident Fund of Michigan, brought an action in the Court of Claims against the State of Michigan, the Accident Fund, and others, alleging that they are owners of any surplus accumulated by the fund in excess of the amount needed to cover liabilities, that the fund's assets are held by the state in trust for the policyholders, and that the policyholders are entitled to distribution of any surplus or profit of a potential sale of the fund by the state. While the suit was pending, the Legislature passed 1993 PA 198, which authorized the state to sell the fund and to retain the proceeds. Thereafter, the court, Thomas L. Brown, J., granted summary disposition for the plaintiffs, concluding that the policyholders of the fund have a vested right in its assets, monies, and surpluses. The Governor, by executive message, then asked the Supreme Court to resolve whether that portion of 1993 PA 198, MCL 418.701a; MSA 17.237(701a), that makes the consideration for the sale of the fund the property of the state is constitutional and in conformance with the law. The State Administrative Board subsequently approved the sale of the fund to Blue Cross and Blue Shield of Michigan.

In an opinion by Justice GRIFFIN, joined by Justices BRICKLEY, BOYLE, and MALLETT, the Supreme Court answered:

The portion of § 701a that declares the consideration for the sale of the Accident Fund to be the property of the State of Michigan does not violate either the state or the federal constitution.

1. The plaintiffs have no contract right in the accumulated surplus reserves of the fund. A state contractual obligation arises from legislation only if the Legislature unambiguously expresses an intention to create an obligation. As a general rule, vested rights are not created by a statute that is later revoked or modified by the Legislature if the Legislature did not covenant not to amend the legislation. Section 711a of 1990

PA 157, in effect when the plaintiffs purchased their policies, provides that Accident Fund premiums were to be set at the lowest level possible, consistent with sound actuarial standards. It was not a promise not to pass § 701a. Section 711a does not mention a possible sale of the Accident Fund or who would own the proceeds of such a sale, nor does it provide a clear expression of legislative intent regarding ownership of the assets of the fund. There is no contract on this point between the policyholders and the state, or an express promise by the Legislature not to change the policy terms for future purchasers.

2. Section 712 of 1990 PA 157 provided a one-time refund to 1986-89 policyholders of the balance remaining after a reduction of the fund surplus to effect a net written premium to surplus ratio of 3.5 to 1. It did not require future adjustment of surplus reserves. Section 746 permits the refund of premiums and the issuing of dividends. Although it establishes a mechanism for the disbursement of funds, whether dividends are declared remains discretionary under § 715. A sale and transfer of the fund would not violate § 746; all liabilities would be assumed by the purchaser, and all surpluses would remain in reserve. There is no language in § 746 to vest any policyholder with the right to a dividend or reduced premium. Rather, it is an expression of general policy. It is not a covenant between the state and policyholders for a specific premium. Absent an explicit expression, a legislative intent that premiums collected but not used to pay liabilities would earn interest or be refunded cannot be read into §§ 711a(1), 712, and 746, separately or together.

3. Section 751 provides for the disposal of the assets of the Accident Fund if chapter 7 of the worker's compensation act is repealed or the fund is dissolved. It does not provide that it will not be amended, and does not mention distribution to or preference of policyholders regarding distribution of fund assets. Because neither contingency has occurred, § 751 does not apply. The policy in effect when premiums were paid by the plaintiffs provided that, in return for the premium, the fund promised to pay benefits required by worker's compensation law. Therefore, while policyholders have a vested contractual right to liability coverage for the period for which premiums have been paid, because the plaintiffs have not demonstrated that the contract thus established has or will be impaired by operation of § 701a, their impairment of contract claim must fail.

4. The plaintiffs have no property right in the assets of the

fund. One who asserts an uncompensated taking claim must first establish that a vested property right is affected. To constitute a vested right, the interest must be something more than a mere expectation based on an anticipated continuance of the present general laws; it must have become a legal or equitable title to the present or future enjoyment of the property at issue. Without a property right, there is no basis for challenging a statute on the ground that it constitutes a confiscatory taking without due process of law. The plaintiffs have not indicated any language in the policies that expressly confers a right of participation by policyholders in any surplus that might have accumulated in the fund or that expressly grants or recognizes an ownership interest of policyholders in the assets of the fund.

5. Statements in case law that the state holds the assets of the Accident Fund in trust did not establish an ownership interest on the part of policyholders. The words were used in an informal, descriptive sense, not as a declaration of a formal trust relationship. The use recognized only a responsibility on the part of the state to assure that fund assets were to be held and expended according to existing law.

6. In the absence of a property right, there can be no taking that violates due process. The fact that an employer is free to purchase insurance from any number of sources does not affect the character of the fund; it is a state agency. Nor does the voluntary nature of an employer's decision by itself establish any property right in the fund. Under the authorizing legislation, the assets and liabilities of the fund will transfer to the buyer. The surplus is not being retained by the state, it will remain as surplus under terms of the sale. Thus, there is nothing, explicit or implicit, in the policy contract, case law, or the governing statutes that gives rise to a vested property interest. In the absence of such a vested property interest, the plaintiffs' claim of confiscatory taking must fail.

Chief Justice CAVANAGH, joined by Justice LEVIN, dissenting, stated that 1993 PA 198, amending the worker's compensation act by adding MCL 417.701a; MSA 17.237(701a), providing that the consideration for the sale of the State Accident Fund is the property of the State of Michigan, is unconstitutional because it violates US Const, Am V; Const 1963, art 10, § 2, and art 1, § 17.

It is clear that the state has no liability beyond the assets of the fund, the assets of the fund are generated exclusively through premiums and their investment, the fund was not originally intended to be run as a business for profit, and the

assets of the fund are to be used exclusively to implement the policies underlying the worker's compensation act. The repeal by 1990 PA 157 of MCL 418.711; MSA 17.237(711), which provided that the fund shall be neither more nor less than self-sufficient, should not change the interest of the insured employers.

The fund was not intended by the Legislature of 1912 to be a business for profit. It was intended to implement the worker's compensation act. The Legislature did not intend the state to obtain a profit from operation of the fund, or gain by reason of an unexpected windfall, at the expense of the premium-paying employers in a declared nonprofit business. The assets of the fund are held in trust for the insured employers, and they have a vested interest in them. If the assets were squandered, they still must provide benefits to any employee who suffers a compensable injury. These vested rights may not be deprived without just compensation.

Justice RILEY took no part in the decision of this case.

*Law, Weathers & Richardson, P.C.* (by *James L. Wernstrom, Douglas W. Van Essen, Ellen S. Carmody,* and *David W. Centner*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Richard F. Zapala* and *George H. Weller,* Assistant Attorneys General, for defendants State of Michigan and Accident Fund of Michigan.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Donald S. Young* and *Thomas M. Pastore,* Special Assistant Attorneys General, for defendants State Administrative Board and Accident Fund Director.

Amici Curiae:

*Jordan Rossen,* General Counsel and *M. Elizabeth Bunn,* Associate General Counsel, and *Greenspon, Scheff & Washington, P.C.* (by *George B. Washington*), for International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW).

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Joseph A. Fink, Jeffery V. Stuckey,* and *William C. Bertrand, Jr.*), for Blue Cross and Blue Shield of Michigan.

GRIFFIN, J. This matter is before us as the result of an executive message of Governor John M. Engler dated May 6, 1994, in which he requested this Court, pursuant to MCR 7.305(A), to address and resolve the question:

Is that portion of 1993 PA 198; i.e. MCL 418.701a; MSA 17.237(701a), which makes that consideration for the sale of the State Accident Fund the property of the state, constitutional and in conformance with the law?

Having granted the request, 446 Mich 1201 (1994), we now answer that the challenged portion of the statute is constitutional.[1]

I

Underlying the certified question presented in the instant case is a lawsuit, *Fun 'N Sun RV, Inc v Michigan,* filed September 21, 1993, in the Court of Claims by two Accident Fund policyholders.[2] They allege, inter alia, that they and other similarly situated policyholders are owners of any surplus accumulated by the fund in excess of the amount needed to cover liabilities, that the fund's assets are held by the state in trust for the policyholders, and that the policyholders are entitled to

[1] In addition to argument provided by the parties in *Fun 'N Sun RV, Inc v Michigan,* which followed our order granting the Governor's request, we had the benefit of briefing by the parties before the issuance of the grant order. Unpublished order of June 9, 1994.

[2] Plaintiffs filed a parallel action in the Ingham Circuit Court that was dismissed on the ground that the Court of Claims had exclusive jurisdiction.

distribution of any surplus or profit of a potential sale of the fund by the state.[3]

While this suit and a motion for summary disposition filed by the defendants were pending, the Legislature passed, and on October 19, 1993, the Governor signed, a series of bills that became effective April 1, 1994, as 1993 PA 195-200.[4] Of particular significance for purposes of the matter before us is 1993 PA 198, now § 701a of the Worker's Disability Compensation Act, MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*, which declares in part:

> (1) The state administrative board . . . may authorize the executive director of the state accident fund to enter into and consummate, under terms and conditions approved by the state administrative board, an agreement in the name of the state of Michigan for the sale of all or substantially all of the assets of the state accident fund to a permitted transferee, and assumption of all or substantially all of the liabilities of the state accident fund by the permitted transferee subject to the following conditions:
>
> *    *    *
>
> (2) The consideration in the transaction . . . shall be the property of the state of Michigan.

On March 9, 1994, the Court of Claims issued an opinion denying defendants' motion for summary disposition. Relying primarily on *Comm'r of Ins v Advisory Bd of the Michigan State Accident*

---

[3] Plaintiffs also asserted, on behalf of a more limited class, a claim that the state inadequately complied with the § 712 requirement of a one-time distribution of excess surplus to 1986-89 policyholders.

[4] Plaintiffs filed a first amended complaint on May 31, 1994, adding count III. Count III alleges that the state's retention of the proceeds of the sale violates their property rights without due process as guaranteed by Const 1963, art 1, § 17 and US Const, Am XIV. Further, count III alleges that the retention of the proceeds impairs an obligation of contract in violation of Const 1963, art 1, § 10.

*Fund,* 173 Mich App 566; 434 NW2d 433 (1988), the court concluded that "the policyholders of the Accident Fund have a vested right to the assets, monies and surpluses of the Accident Fund . . . ."

On June 15, 1994, the State Administrative Board announced its approval of an agreement for the sale and transfer of the fund's assets and liabilities to Blue Cross and Blue Shield of Michigan for consideration in the sum of $291,000,000.

One provision of the legislation authorizing such a sale, § 701a(2), provides that except for one percent to be used for winding up the affairs of the Accident Fund, the consideration received by the state is to go into the "rainy day fund" established pursuant to § 351 of 1984 PA 431. Another provision indicates that any agreement for sale of the Accident Fund, § 701a(3)(a), is to be consummated by December 31, 1994, 1993 PA 198, § 3(1).

Before turning to the arguments presented in support of plaintiffs' challenge to the constitutionality of 1993 PA 198, MCL 418.701a; MSA 17.237(701a),[5] an overview of the historical context preceding this dispute is provided to aid our analysis.

II

In 1912, worker's disability compensation was first adopted and implemented in this state. The original legislation included provisions to establish the Accident Fund as an optional source from which employers could obtain liability insurance.[6]

[5] While claiming that the assets of the fund are held in trust, plaintiffs have not directly challenged the authority of the state to sell the fund. Moreover, there appears to be no controversy in this case concerning the value of the assets of the fund or the sale price.

[6] 1912 PA (1st Ex Sess) 10, pt V, the predecessor to the Worker's Disability Compensation Act, MCL 418.101 *et seq.*; MSA 17.237(101) *et seq.*

The Accident Fund was to be administered by the Commissioner of Insurance under a statutory directive that the fund be "neither more nor less than self-supporting . . . ." *Id.* In 1917, an advisory board nominated by the policyholders was established to "advise with the Commissioner of Insurance as to the means and methods of administering the affairs of said accident fund . . . ."[7] 1917 PA 206, § 13.

In 1969, the original legislation, as amended, was repealed and replaced by MCL 418.701 *et seq.*; MSA 17.237(701) *et seq.* as part of a general revision of worker's compensation law. The basic statutory framework relating to the fund remained intact, including the mandate that its purpose was not profit making, but to be neither more nor less than self-supporting.

In 1976, the Attorney General issued an opinion, stating that the Accident Fund is a state agency and that the fund's employees are subject to civil service classification.[8] Instead of settling a dispute, the opinion seemed to revitalize a continuing controversy between the Commissioner of Insurance and the Advisory Board over who had control of the Accident Fund.

In 1981, the Advisory Board filed a suit in federal district court against the Commissioner of Insurance, seeking a ruling that the fund was not a state agency. *Accident Fund v Baerwaldt,* WD Mich, Case No. G81-224 (1982). The board did not prevail on this issue; however, several policyholders who joined in the suit as plaintiffs enjoyed more success with their claim that the assets of

[7] The 1917 PA 206, § 12 enactment provided for an annual election by policyholders of a board consisting of employer members for two-year terms. Almost identical provisions are currently found at MCL 418.755; MSA 17.237(755).

[8] OAG, 1975-1976, No 5,147, p 695 (December 7, 1976).

the fund were held in trust and could not be taken by the state for general purposes. In a consent judgment, the commissioner agreed that under the then-existing statutory scheme the "assets, monies and funds held for or by the Michigan State Accident Fund" could not be borrowed, taken, or placed in the general fund by the state, or "used for purposes inconsistent with the Worker's Disability Compensation Act of 1969 and its amendments . . . ."[9]

More litigation followed in 1983, when the Commissioner of Insurance filed a suit, which, among other things, challenged the authority of the Advisory Board to increase rates without his approval. However, the central issue presented for review to the Court of Appeals in *Comm'r of Ins, supra,* was whether the Accident Fund is a state agency.

The Court of Appeals held that the fund is a state agency and that it is not a mutual insurance company. The Court determined that the fund was subject to the supervisory and administrative control of the Commissioner of Insurance and that its employees were entitled to civil service classification. The Court also addressed a counterclaim of the Advisory Board that the state has no equity interest, or interest other than as trustee, in the fund's monies, reserves, or surplus. Referring to two statutory provisions in the WDCA, §§ 705[10] and 711, the Court of Appeals stated:

---

[9] The consent judgment also recited that the state of Michigan "has no known, ripe or outstanding claims to or equity interest, or any interest other than as trustee, in the assets, monies and funds held for or by the Michigan State Accident Fund." Eventually, this suit was dismissed on abstention grounds. *Accident Fund v Baerwaldt,* 579 F Supp 729 (WD Mich, 1984), aff'd without published opinion 767 F2d 919 (1985), cert den 474 US 1020 (1985).

[10] Section 705 provides:

There shall be maintained in the accident fund a sufficient amount of cash to pay losses and expenses and the balance may be invested by the executive director of the state accident fund

Clearly, under the statute, the Commissioner of Insurance, acting in concert with the State Treasurer, has the authority to hold the funds of the Accident Fund and to invest those funds. MCL 418.705; MSA 17.237(705); see also *McAvoy* [*v H B Sherman Co,* 401 Mich 419, 450; 258 NW2d 414 (1977)] (state control over Second Injury Fund). However, it must also be noted that MCL 418.711; MSA 17.237(711) provides that the Accident Fund shall be neither more nor less than self-supporting. We interpret *this provision* to mean that just as the state does not subsidize the Accident Fund, neither can it receive any "profits" from the fund to expend for other purposes. Thus, while the State of Michigan holds the assets of the Accident Fund *in trust* and, through the Commissioner of Insurance and the State Treasurer, has control over those funds and the authority to invest the funds, it can withdraw no money from the fund to use for any other state expenditures and *those funds may only be expended to further the purpose of the Accident Fund.* [173 Mich App 588. Emphasis added.][11]

At the time the fund was created, and until as recently as 1990, § 711 provided direction that the Accident Fund was to be "neither more nor less than self-supporting . . . ." However, in 1990, comprehensive changes were made by enactment of legislation, the described purpose of which was to put "the Fund on an equal footing with private

and the state treasurer acting together, in such securities as are specified by law for investment by casualty insurance companies.

[11] The Advisory Board applied to this Court for leave to appeal the rulings of the Court of Appeals concerning designation of the fund as a state instrumentality, the subjection of the employees to civil service, and the authority of the Insurance Commissioner to set rates. Neither party sought to appeal the ruling respecting the state's interest in the fund's surplus or other assets. Leave to appeal was denied, with Justices BRICKLEY and BOYLE indicating they would have granted the application. 433 Mich 872 (1989).

insurers in the marketplace and ensure that it did not compete unfairly with them."[12]

In addition to repealing § 711 (which required the fund "to be neither more nor less than self-supporting"), enactment of 1990 PA 157 effected a number of fundamental changes in the structure and operation of the Accident Fund. The act, inter alia, (1) made the Accident Fund an "autonomous entity in the department of commerce"; (2) provided for an executive director to be appointed by the Governor for a four-year term; (3) added § 711a, which substituted for § 711 a provision that rates were to be as low as possible consistent with sound actuarial standards; (4) included a new § 712, providing for a one-time distribution of excess surplus to holders of policies during the period 1986 through 1989; and (5) required payment to the state and local governments of certain fees in lieu of taxes.

III

The arguments of plaintiffs in *Fun 'N Sun* can be grouped under two constitutional headings: impairment of an obligation of contract, and deprivation of property without compensation. While these are separate theories, each requires that plaintiffs demonstrate ownership of specific contract rights or property rights. Without such a demonstration, there can be no impairment or deprivation. We hold that plaintiffs have no such

[12] Senate Legislative Analysis, SB 885, June 19, 1990. As introduced, SB 885 was designed to privatize the fund. The original bill included provisions declaring that "the Fund would be neither an agency nor instrumentality of the State" and that "[a]ssets of the Fund would accrue to the benefit of the member employers." However, these provisions were rejected by the Senate Committee on Human Resources, which reported a version of the bill that contained no reference to privatization. Senate Legislative Analysis, SB 885 (as introduced), April 3, 1990.

contract or property rights. We first consider the impairment of contract claim.

IV

Plaintiffs assert that they have a contractual right to the accumulated surplus reserves. Further, they claim that this "right" will be unconstitutionally impaired if the state is permitted to retain the proceeds obtained from the proposed sale by operation of § 701a(2). It is plaintiffs' position that implicit in statutory provisions in effect when the policies in question were purchased was a contractual promise that premiums would remain as low as possible. It would then follow that there should not have been any accumulation of surplus reserves. According to plaintiffs' interpretation, surplus reserves should have been returned to the policyholders either in the form of reduced premiums or dividends. Plaintiffs rely on specific sections of the WDCA, §§ 711a, 712, 746, and 751, which shall be addressed seriatim, after we provide a brief summary of the law on impairment of contract and contract rights arising from statutes.

A

Both the federal and state constitutions prohibit the enactment of state law that impairs existing contractual obligations. US Const, art I, § 10; Const 1963, art 1, § 10. The language contained in our state constitution, virtually identical to that used in the federal constitution, provides: "No bill of attainder, ex post facto law or law impairing the obligation of contract shall be enacted."[13]

---

[13] US Const, art I, § 10 states, in part, "No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."

It has been said that the purpose of the Contract Clause is to protect bargains reached by parties by prohibiting states from enacting laws that interfere with preexisting contractual arrangements. *Allied Structural Steel Co v Spannaus,* 438 US 234, 242; 98 S Ct 2716; 57 L Ed 2d 727 (1978).

In examining a claim that a state law impairs an existing contract, the United States Supreme Court has adopted a three-pronged test, with the first prong being a determination "whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Id.,* p 244; *Romein v General Motors Corp,* 436 Mich 515; 462 NW2d 555 (1990). The second prong requires that the legislative disruption of contract expectancies be necessary to the public good, and the third prong requires that the means chosen by the Legislature to address the public need are reasonable. *Allied, supra,* p 247, citing *United States Trust Co v New Jersey,* 431 US 1, 23; 97 S Ct 1505; 52 L Ed 2d 92 (1977); *Romein, supra,* pp 535-536.

Because plaintiffs claim that the state law regarding the sale of the fund impairs the contract they had by operation of previously enacted legislation, we must address the first prong of the test for impairment of contract and determine what contractual rights, if any, the previous legislation established.

"Courts usually have concluded that a state contractual obligation arises from legislation only if the legislature has unambiguously expressed an intention to create the obligation. See, e.g., *Charles River Bridge v Warren Bridge,* 36 US (11 Pet) 420, 544; 9 L Ed 773 (1837); *United States Trust Co v*

Plaintiffs have not argued, nor have we discovered, any basis in this case for finding greater protection under the state constitution than under the federal constitution for either constitutional claim. See *Sitz v Dep't of State Police,* 443 Mich 744; 506 NW2d 209 (1993).

*New Jersey,* 431 US 1, 17, n 14; 97 S Ct 1505; 52 L
Ed 2d 92 (1977) . . . ." *Eckles v State,* 306 Or 380,
390-391; 760 P2d 846 (1988). In order to prove that
a statutory provision has formed the basis of a
contract, the language employed in the statute
must be "plain and susceptible of no other reason-
able construction" than that the Legislature in-
tended to be bound to a contract. *Stanislaus Co v
San Joaquin & King's River Canal & Irrigation Co,*
192 US 201, 208; 24 S Ct 241; 48 L Ed 406 (1904).
As a general rule, vested rights are not created by
a statute that is later revoked or modified by the
Legislature if "the Legislature did not covenant
not to amend the legislation." *Franks v White
Pine Copper Div,* 422 Mich 636, 654; 375 NW2d
715 (1985). Yet, a statute can create a contract if
the language and circumstances demonstrate a
clear expression of legislative intent to create
private rights of a contractual nature enforceable
against the state. *United States Trust v New
Jersey, supra,* p 17, n 14; *Blue Cross & Blue Shield
of Michigan v Governor,* 422 Mich 1; 367 NW2d 1
(1985).

Pertinent examples of statutory provisions that
do, and do not, rise to the level of contractual
obligations are found in the Oregon Supreme
Court case of *Eckles, supra.* That case involved
Oregon's Industrial Accident Fund (IAF), which is
much like Michigan's Accident Fund. In 1982, the
Oregon Legislative Assembly declared that the IAF
had a surplus of $168 million and passed a "Trans-
fer Act" to appropriate $81 million of that to the
Oregon general fund. 306 Or 382. An employer
insured by the fund brought suit to declare the
legislation void on a number of grounds, including
impairment of contract. Like this case, the em-
ployer did not rely on the actual contract of insur-
ance, but a claim that certain portions of the

Oregon worker's compensation statute were a contractual obligation.[14]

Among provisions in the Oregon statute was Or Rev Stat 656.634(1), which indicated, in part, "The Industrial Accident Fund is a trust fund exclusively for the uses and purposes declared in [Or Rev Stat 656.001 to 656.794, the Oregon worker's compensation statute] . . . ." The Oregon Supreme Court stated, "[I]f the Legislative Assembly had simply provided in Or Rev Stat 656.634 that the IAF was to be used for the purposes stated in Or Rev Stat 656.001 to 656.794, a contractual obligation probably could not have been inferred from the provision because it would have contained nothing indicative of a legislative commitment not to repeal or amend the statute in the future." 306 Or 391, citing *Methodist Hosp of Brooklyn v State Ins Fund,* 64 NY2d 365, 377-378; 476 NE2d 304 (1985) (the statutory directives regarding proper uses of an insurance fund did not create a contractual obligation).

However, given the existence at the time the plaintiffs purchased their policies of a statute specifically disclaiming Oregon's proprietary interest in the fund, Or Rev Stat 656.634(2), the *Eckles* court had "little doubt" that the provision "expressed a contractual promise of the state to employers who insured with SAIF that the state would not transfer IAF funds to the General Fund." 306 Or 393.

The former provision disclaiming Oregon's inter-

---

[14] The *Eckles* court observed that the allegations in that suit did not allege an impairment of the contract between the State Accident Insurance Fund Corporation (SAIF) and the employer. "Plaintiff does not point to any obligation of SAIF that SAIF has been excused from performing by virtue of the Act." 306 Or 389. Rather, if any obligation was impaired, it was an obligation of the state. Similarly, plaintiffs in *Fun 'N Sun* do not allege that they will not receive the full insurance for which they have contracted with the Accident Fund.

est in the fund, Or Rev Stat 656.634, had declared
in part that the state "has no proprietary interest
in the Industrial Accident Fund" and denied "any
right of reclamation it may have had in that
fund." The subsequent Transfer Act included lan-
guage repealing the disclaimer of interest. Insofar
as the transfer provision retroactively amended
preexisting contracts as established by the dis-
claimer, the court ruled the transfer provision
violated the contract clause of Oregon's constitu-
tion. 306 Or 399.

However, the subsequent repeal of the dis-
claimer meant employers who purchased policies
after the repeal could not claim their contracts
were impaired by operation of the provisions to
transfer funds from the IAF to the general fund. *Id.*

We now turn to the specific statutory provisions
relied on by plaintiffs.

B

Beginning with § 711a of the 1990 amendments,
plaintiffs claim that their policies were purchased
with the understanding that surplus would be
distributed to policyholders either in the form of
reduced premiums or dividends. Section 711a pro-
vides that "premiums . . . shall be at the lowest
level possible, consistent with sound insurance
actuarial standards." This provision was enacted
at the time the break-even provisions of § 711 were
repealed. Section 711a was in effect when the
policyholders in question purchased their policies.
Plaintiffs assert, in effect, that § 711a's require-
ment to keep premiums low amounted to a prom-
ise not to pass § 701a(2), which gave rise to the
certified question before us.

There is no mention in § 711a of a possible sale
of the Accident Fund. Nor is there any suggestion

who would own the proceeds of such a sale. Thus, there is no clear expression of legislative intent in § 711a regarding ownership of the assets of the Accident Fund. As was true in *Eckles, supra,* there is no contract on this point between the policyholders and the state.

While we agree with plaintiffs in their assertion that the terms of contract in this case are not necessarily limited to the face of the policy, we do not find in § 711a any express promise by the Legislature not to change the policy terms for future purchasers.

Another reason we cannot accept plaintiffs' argument that § 711a created an implied contractual right of the policyholders to excess surplus is because in the same 1990 act that adopted § 711a, the Legislature created a limited right to excess surplus in § 712. We now turn to plaintiffs' next argument based on § 712.

C

Plaintiffs maintain that the enactment of § 712 in 1990 meant the fund was obliged to maintain excess reserves at a ratio of 3.5 to 1, net written premium to surplus, and to distribute any excess surplus to policyholders.[15] We disagree.

Section 712(1) provides:

The insurance commissioner shall make a determination of the amount of surplus of the accident fund existing at the end of the calendar quarter in which the effective date of the amendatory act that added this section occurs. After the determination is made, the commissioner shall require a reduction in surplus not later than 60 days after

---

[15] This ratio means that for every $3.50 collected in net written premium, one dollar is set aside for reserves over and above those necessary to pay known liabilities.

the date of this determination so that the state
accident fund will have a net written premium to
surplus ratio of 3.5 to 1. The amount of premium
shall be determined at the end of the first quarter
of 1990 based on the previous 12 months.

We interpret the 1990 legislation as a provision
for a one-time payment to 1986-89 policyholders of
the balance left after surplus was reduced to a
"net written premium to surplus ratio of 3.5 to 1"
at the end of the calendar quarter in which the
amendment went into effect. There was, and is, no
provision in the act requiring future adjustment of
surplus reserves. Section 712(1) obliged the state
only to set the ratio of net written premium to
surplus at 3.5 to 1. Future determinations of the
surplus to premium ratio after the funds were
placed in escrow were left to the discretion of the
Commissioner of Insurance.

D

Plaintiffs interpret § 746 of the wdca as implic-
itly granting policyholders ownership rights in
surplus reserves.[16] However, there is no language

[16] Section 746 of the wdca provides in pertinent part:

(1) The executive director shall maintain a revolving fund
derived from premiums collected from members of the fund.
The revolving fund shall be used exclusively for the following
purposes:

(a) Payment, handling, and servicing of claims.

(b) Payment of fees imposed by this act or as otherwise
provided by law.

(c) Insurance expenses, including agent's commissions.

(d) The operating budget of the fund.

(e) Investments.

(f) Transactions with the Michigan workers compensation
placement facility.

(g) Reinsurance.

(h) Refunds of premiums or applicant's funds.

(i) Dividends and similar payments to policyholders.

in this section to vest any policyholder with the right to a dividend or reduced premium. Section 746 merely provides that the executive director shall maintain a revolving fund derived from premiums, and that the fund is to be used only for nine enumerated purposes. The purposes include refunding premiums and issuing dividends.

Section 746 establishes the mechanism for the disbursement of funds. Should a dividend be declared by the executive director, § 746 allows disbursement without an appropriation from the Legislature. However, whether dividends are declared remains discretionary under § 715.[17]

Section 746 will not be violated by the sale and transfer of the fund. Plaintiffs have not alleged any misuse of premiums by the executive director. The premiums collected to date will be transferred intact by the terms of the sale. See MCL 418.701a; MSA 17.237(701a). All liabilities will be assumed by the purchaser. 1993 PA 200, i.e., MCL 500.5106; MSA 24.15106. All surplus will remain in reserve.[18]

We find the rationale of the highest court in New York State to be persuasive when it ruled on the constitutionality of the transfer of $190 million from the State Insurance Fund to the state's general fund.[19] *Methodist Hosp, supra.* Presented with a claim that the reserves of the state insurance fund were held in trust for the benefit of policyholders by operation of a low premium statute similar to our § 711a, the *Methodist Hosp* court

---

[17] See n 26 and accompanying text.

[18] In fact, the terms of the purchase agreement call for more surplus to be set aside by the purchaser to reach and maintain a ratio of 1.5:1, net written premiums to surplus.

[19] The New York legislation provided that the State Insurance Fund would be paid back, but reappropriated annually to the general fund. The transfer occurs without interest being paid to the State Insurance Fund. *Methodist Hosp, supra,* p 372.

concluded that there was no impairment of contract.

In *Methodist Hosp,* the plaintiff relied in part on the last sentence of the New York Workers' Compensation Law, § 76(1), which provided, "Such fund shall be applicable to the payment of losses sustained on account of insurance, to the payment of expenses in the manner provided in this chapter and to the payment of premiums for reinsurance in any insurance corporation of the whole or any part of any policy obligations." As here, the policyholder argued that the limited list of permissible use of fund monies implied "a legislative intent that policyholders have a property interest in its surplus." 64 NY2d 376. The New York Court of Appeals answered that the provisions "simply do not deal with what is to be done with surplus . . . ." 64 NY2d 376-377. The court concluded that the language used by its legislature evidenced legislative policy, not legislative intent to be bound in a contract. As such, the statute did not support plaintiffs' interpretation that a contract was intended. *Methodist Hosp, supra,* p 377, citing *Methodist Hosp of Brooklyn v State Ins Fund,* 102 AD2d 367, 378-379; 479 NYS2d 11 (1984).[20]

Absent an explicit expression of the Legislature's intention that premiums collected and not used to pay liabilities either would earn interest or be refunded, we cannot read §§ 711a(1), 712, and 746, either separately or together, as so promising.[21] The language of § 746 is an expression of

[20] The Oregon Supreme Court applied similar reasoning in *Eckles, supra.*

[21] We reject plaintiffs' assertion that *Methodist Hosp* should be distinguished on the basis that the State of New York is ultimately liable should the state insurance fund assets be insufficient to pay claims, whereas the State of Michigan has structured its accident fund in a manner that does not expose the state's general fund to the risk of insolvency.

general policy. It is not a covenant between the state and policyholders for a specific premium.[22]

E

Plaintiffs likewise assert that § 751 of the WDCA creates contractual rights that control the disposition of fund assets.[23] Section 751 provides that the Ingham Circuit Court will dispose of Accident Fund monies if chapter 7 of the WDCA is repealed or the commissioner deems it necessary to dissolve the fund. We reject this argument for three reasons. First, there is no indication in the section of

Nongovernmental persons legitimately shield themselves from liability by use of corporate structures. Individuals own corporations. Corporations own subsidiaries. No one would argue that the owner of a corporation is not the owner just because the owner is not liable for the corporation's debts. Similarly, plaintiffs show no reason why the State of Michigan should not be able to create and own an entity for a specific purpose and not be liable for its debts. Yet, that is the effect of plaintiffs' argument.

[22] Section 715 of the WDCA leaves the determination of premium rates to the discretion of the Commissioner of Insurance when it provides in pertinent part:

> Subject to chapter 24 of the insurance code of 1956, . . . being sections 500.2400 to 500.2484 of the Michigan Compiled Laws, the executive director may . . . prescribe when and in what manner the premiums and assessments shall be paid, may change the amount thereof in respect to any or all of such employers as circumstances may require and the condition of the respective plants, establishments, or places of work in respect to the safety of their employees may justify. However, premiums or assessments shall be levied on a basis that shall not be excessive, inadequate, or unfairly discriminatory.

[23] Section 751 of the WDCA provides:

> If this chapter is repealed, or if in the judgment of the commissioner it becomes necessary to dissolve the accident fund, all moneys which are in the accident fund at such time shall be subject to disposition under the direction of the circuit court for the county of Ingham, with due regard to the obligation incurred and existing to pay compensation under the provisions of this act.

a promise by the Legislature not to amend it.
Second, § 751 makes no mention of distribution to,
or preference of, the policyholders regarding the
disposition of fund assets. Third, neither contin-
gency has occurred, and the section is not applica-
ble. The chapter has not been repealed, nor has
the Commissioner of Insurance decided it is neces-
sary to dissolve the fund.

Because we do not interpret the contractual
promises inherent in the statutory scheme when
the policies in question were purchased, §§ 711a,
712, 746 and 751, to be those urged by plaintiffs,
we need not proceed to the second or third prong
of the impairment of contract analysis. The policy
in effect when premiums were paid by plaintiffs
provided that, in return for the premium, the fund
promised to pay benefits required by the worker's
compensation law. Therefore, policyholders do
have a vested contractual right to liability cover-
age for the period in question for which premiums
have been paid. But they have not demonstrated
that the contract thus established has, or will be,
impaired by operation of § 701a. Plaintiffs' impair-
ment of contract claim must therefore fail.

V

Having found no violation of the Contract
Clause, we next address the policyholders' conten-
tion that the legislation in question constitutes a
taking of private property without compensation
in violation of the state and federal constitutions.
Relying on the Court of Appeals decision in
*Comm'r of Ins, supra,* plaintiffs claim that § 701a
is unconstitutional because the policyholders
"own" the assets being transferred to Blue Cross
and Blue Shield of Michigan. They argue that the

assets of the fund are held by the state in trust for the benefit of the policyholders.[24]

A

The constitutions of both the United States and the State of Michigan provide that private property shall not be taken without due process or just compensation. US Const, Am V; Const 1963, art 10, § 2, and art 1, § 17.[25]

The United States Supreme Court has often repeated that the purpose of the constitutional prohibition against the government's taking private property without providing just compensation is " 'to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Dolan v City of Tigard,* 512 US —, —; 114 S Ct 2309; 129 L Ed 2d 304, 316 (1994), quoting *Armstrong v United States,* 364 US 40, 49; 80 S Ct 1563; 4 L Ed 2d 1554 (1960); see also *Hodel v Irving,* 481 US 704, 714; 107 S Ct 2076; 95 L Ed 2d 668 (1987); *Kaiser Aetna v United States,* 444 US 164, 175; 100 S Ct 383; 62 L Ed 2d 332 (1979); *Penn Central Transportation Co v New York City,* 438 US 104, 124; 98 S Ct 2646; 57 L Ed 2d 631 (1978).

One who asserts an uncompensated taking claim

---

[24] Plaintiffs' property claim is not as clearly differentiated from their impairment of contract claim as this discussion makes it appear. They also argue that their contract rights are property rights. However, as we have concluded above, they have no contract rights beyond the right to insurance.

[25] US Const, Am V provides in part: "nor shall any person . . . be deprived of life, liberty, or property without due process of law; nor shall private property be taken for public use, without just compensation."

The Fifth Amendment of the federal constitution is applicable to the states through the Fourteenth Amendment. *Penn Central Transportation Co v New York City,* 438 US 104, 122; 98 S Ct 2646; 57 L Ed 2d 631 (1978).

must first establish that a vested property right is affected. *Minty v Bd of State Auditors,* 336 Mich 370, 390; 58 NW2d 106 (1953). To constitute a vested right, the interest must be " 'something more than such a mere expectation as may be based upon an anticipated continuance of the present general laws; it must have become a title, legal or equitable, to the present or future enjoyment of property . . . .' " *Id.,* quoting 2 Cooley, Constitutional Limitations (8th ed), p 749. Without a property right, a plaintiff has no basis for challenging a statute on the ground that it constitutes a confiscatory taking without due process of law. *McAvoy v H B Sherman Co, supra* at 451.

As policyholders, plaintiffs have not pointed to any language in the insurance policies issued by the fund that expressly confers a right of participation in any surplus that might have accumulated in the fund.[26]

Nor has attention been called to any other provision of the policy that expressly grants or recognizes an ownership interest on the part of policyholders in the assets of the fund. In asserting their claim, plaintiffs rely on the statutory scheme in place when they purchased their insurance and interpretations given to statutory provisions by the courts. However, the only express references in the statute to surplus distribution are found in § 712 (the one-time distribution to 1986-89 policyholders, which is not the subject of this appeal),[27] and in § 746,[28] which gives the executive director discre-

[26] The policy provides: "you will receive any dividends declared on this policy in accordance with the provisions of applicable law." Under the statutory framework, it appears that whether a dividend is declared is a matter left to the discretion of the fund's executive director.

[27] Count II in *Fun 'N Sun* asserts that defendants placed too little money in escrow.

[28] See n 16.

tion to pay dividends to policyholders. Because § 746 makes no promise that dividends will ever be paid, it does not create a vested right.[29]

B

Against that background, we look at the "trust" language used by the Court of Appeals in *Comm'r of Ins* and consider its significance today. As noted earlier, the Court focused on former § 711 and said: "We interpret *this provision* to mean that just as the state does not subsidize the Accident Fund, neither can it receive any 'profits' from the fund to expend for other purposes."

The Court continued:

> Thus, while the State of Michigan holds the assets of the Accident Fund *in trust* and . . . has control over those funds . . . , it can withdraw no money from the fund to use for any other state expenditures and *those funds may only be expended to further the purpose of the Accident Fund.* [173 Mich App 588. Emphasis added.]

We note that the "trust" language then employed by the Court did not speak in terms of an ownership interest on the part of policyholders. Indeed, the Court did not expressly identify any beneficiary of the "trust" to which it referred.

We are convinced that the Court of Appeals used the words "in trust" in an informal, descriptive sense, rather than as declaration of a formal trust relationship. The Court did not review any

---

[29] Cf. *Methodist Hosp, supra,* 64 NY2d 377, "What has been said so far establishes that State Insurance Fund policyholders have no property interest in the surplus of the Fund, *short of the actual declaration of a dividend* by the Commissioners." (Emphasis supplied.)

law on the creation of trusts,[30] for instance, on express trusts.[31] The Court did not make any findings regarding the type of inequitable conduct that would lead to the imposition of a constructive trust.[32] The better inference is that the Court of Appeals used the words "in trust" in the sense that the state's receipt of the policyholders' premiums resulted in an obligation to manage those premiums to assure the intended benefit, insurance coverage.[33]

---

[30] Section 17 of the Restatement of Trusts, 2d, p 59, states:

A trust may be created by

(a) a declaration by the owner of property that he holds it as trustee for another person; or

(b) a transfer inter vivos by the owner of property to another person as trustee for the transferor or for a third person; or

(c) a transfer by will by the owner of property to another person as trustee for a third person; or

(d) an appointment by one person having a power of appointment to another person as trustee for the donee of the power or for a third person; or

(e) a promise by one person to another person whose rights thereunder are to be held in trust for a third person.

[31] For example, 89 CJS, Trusts, § 42, pp 770-772 states:

A sufficient declaration of trust is essential to the creation of an express or voluntary trust, which . . . when the statute so requires, must be in writing. Such trusts are generally created by an instrument or instruments pointing out directly and expressly the property, persons, and purpose of the trust, or by an agreement or contract between the parties expressing the intended trust. The declaration must contain sufficient words to create the trust, and it must embody all the essential elements of a trust. It must express the intention to create a trust . . . and state with certainty the terms, subject, persons, and object of the trust; and it has been stated that the trustee must be authorized and directed to perform certain duties and assume certain obligations. A trust is not created unless the settlor imposes enforceable duties on the transferee.

See also *Townsend v Gordon,* 308 Mich 438; 14 NW2d 57 (1944).

[32] See *Kent v Klein,* 352 Mich 652; 91 NW2d 11 (1958), and *Union Guardian Trust Co v Emery,* 292 Mich 394; 290 NW 841 (1940).

[33] We also note that the Court of Appeals in *Comm'r of Ins* could

Plaintiffs argue that the supposed recognition of a trust in *Comm'r of Ins* is supported by similarities between their situation and the members of a mutual insurance company because in both instances the policyholder/member is subject to assessment if premiums are insufficient to pay claims. We disagree. Unlike members of a mutual insurance company, those who purchase insurance from the Accident Fund have no effective voice in the operation or management of the enterprise. Their only role is to participate in the selection of an advisory board, whose authority is limited to providing advice to the commissioner. See § 755. As noted in 6 Couch, Insurance, 2d (rev ed), § 34:119, p 970: "A policyholder in a mutual life insurance company has a property interest in the surplus of the company . . . . In contrast, under a nonparticipating policy the insured is not entitled to any portion on division of surplus by the insurer."[34]

In *Methodist Hosp, supra,* the New York Court of Appeals considered and rejected an argument that the New York State Accident Fund was a

only consider the claims raised in that litigation and the then-current statutes. There was no legislative authority for the sale of the Accident Fund at that time, and no claim based on a potential sale.

[34] If the Legislature had seen fit to establish the fund as a mutual insurance company, of course, plaintiffs would be in a better position to assert a property interest in the surplus of the fund:

> The principle which lies at the foundation of mutual insurance and gives it its name is mutuality; in other words, the intervention of each person insured in the management of the affairs of the company and the participation of each member in the profits and losses of the business in proportion to his interest. [*Kamm & Schellinger Brewing Co v St Joseph Co Village Fire Ins Co,* 168 Mich 606, 620; 134 NW 999 (1912).]

Because the fund is not a mutual insurance company, see *Comm'r of Ins, supra,* p 580, any claim that would analogize the rights of the policyholders to those of members of a mutual insurance company is inapposite.

mutual fund. Citing 2 Couch, Insurance, 2d (rev ed), § 19.14, p 679, the court responded:

Nothing in article 6 of the Workers' Compensation Law expressly establishes the SIF [State Insurance Fund] as a mutual insurance organization. A mutual insurance company is organized and operated for the benefit of its policyholders who are by virtue of their policies members of the company . . . with the possible exception of companies whose annual dividends are mandated by statute, the right to receive a dividend when declared creates no trust or property interest of the policyholder in the surplus . . . . [64 NY2d 374-375. Citations omitted.]

The "trust" language used by the *Comm'r of Ins* panel did not establish an ownership interest in the policyholders, but recognized only a responsibility on the part of the state to assure that assets of the fund were to be held and expended in accordance with the provisions of existing law. Of course, the principal beneficiaries of the proper exercise of such a responsibility are the employees who may be injured, as well as the employers who are insured. We conclude, however, that recognition of such a relationship conferred no property right or ownership interest in the assets of the fund.

As *McAvoy* instructed, in the absence of a property right, there can be no taking that violates due process. In *McAvoy,* this Court considered a claim of confiscatory taking involving the Second Injury Fund (SIF). Like the Accident Fund, the SIF was created by the Legislature as part of the WDCA. It insures "carriers and self-insured employers against certain losses occurring due to worker's compensation claims." *Id.,* p 450. Because carriers are required by law to pay into the SIF, the *McAvoy* plaintiff, a carrier, complained that any

reimbursement it received from the fund was "self-reimbursement," which constituted a confiscatory taking. In rejecting this contention, Justice MOODY, speaking for the Court, explained:

> The Second Injury Fund does *not* belong to the carriers. No employer or carrier has a direct or vested interest in the fund.
>
> \* \* \*
>
> Since the Second Injury Fund is a creature of the state, no property right would inure to the employers or carriers. Without a corresponding property right, it could not be maintained that the instant reimbursement provision constitutes a confiscatory taking without due process of law. [*Id.,* pp 450-451.]

In its *Fun 'N Sun* opinion, the Court of Claims distinguished *McAvoy* on the ground that SIF insureds "are required by law to pay into the fund," whereas one who becomes an Accident Fund policyholder does so voluntarily.

It is true that employers who purchase insurance from the Accident Fund do so voluntarily. Indeed, they make a decision each year whether to choose the Accident Fund from among more than two hundred carriers offering similar coverage in Michigan. However, the fact that an employer is free to purchase insurance from any of a number of sources does not affect the character of the Accident Fund; it is a state agency. Moreover, the voluntary nature of an employer's decision to purchase insurance from the Accident Fund does not, by itself, establish any property right in the fund.

Cases cited by the Court of Claims in which other state courts had employed similar trust language focused primarily on the protection of insurance funds from appropriations that would undermine protection otherwise provided for injured

workers.[35] There is no suggestion here that Michigan workers will have less protection if the proposed sale is consummated. Rather, there is reason to believe that worker protection would be enhanced.[36]

Plaintiffs have not contended that there is any aspect of the proposed sale of the fund pursuant to 1993 PA 198 that is inconsistent with the purposes of the WDCA. Under the authorizing legislation, the assets and liabilities of the fund will transfer to the buyer. The surplus is not being retained by the state. It will remain as surplus under the terms of the sale.

None of the cases cited by plaintiffs as authority for policyholder ownership of fund assets involved the sale of a business with the buyer purchasing all assets and assuming all liabilities.[37]

---

[35] See *Moran v State ex rel Derryberry,* 534 P2d 1282 (Okla, 1975); *Chez v Utah Industrial Comm,* 90 Utah 447; 62 P2d 549 (1936).

[36] Section 700(b) provides that any purchaser of the Accident Fund must be an insurer organized pursuant to chapter 51 of the Insurance Code. MCL 500.5100 *et seq.*; MSA 24.15100 *et seq.* Such a purchaser is required to be a member of the Property and Casualty Guaranty Association (PCGA), which is organized pursuant to MCL 500.7901 *et seq.*; MSA 24.17901 *et seq.* to cover claims against an insolvent member.

The Accident Fund, on the other hand, is not a member of the PCGA, and the state is not "liable or responsible for the payment of claims for compensation . . . beyond the extent of the sums so collected and received." § 701(1).

[37] *McArthur v Smallwood,* 225 Ark 328, 333-334; 281 SW2d 428 (1955) (the Legislature's clear designation of the workmen's compensation commission fund as "cash funds" meant that it irrevocably pledged that fees paid by worker's disability compensation insurance carriers and self-insurers would not be available for general purposes); *State ex rel Williams v Musgrave,* 84 Idaho 77, 84-85; 370 P2d 778 (1962) (where the statute provides that the state treasurer is the custodian of the workmen's compensation fund, the state insurance manager may authorize expenditures in furtherance of the fund's purposes without an appropriation by the legislature); *Senske v Fairmont & Waseca Canning Co,* 232 Minn 350, 355; 45 NW2d 640 (1951) (where the statute provided that the state treasurer was the custodian of the compensation fund and that the industrial commis-

We find nothing, explicit or implicit, in the policy contract or the governing statutes that gives rise to the vested property interest asserted by plaintiffs. In the absence of such a vested property interest, their claim of confiscatory taking must fail.

VI

Accordingly, our answer to the certified question is that the portion of § 701a that declares the consideration for the sale of the Accident Fund to be the property of the State of Michigan does not violate either the state or the federal constitution.

BRICKLEY, BOYLE, and MALLETT, JJ., concurred with GRIFFIN, J.

CAVANAGH, C.J. (*dissenting*). Michigan's State Accident Fund appears to be similar to funds throughout the nation. The status of all these funds are determined by the statutes that create

sion would direct disbursements, the state treasurer is vested only with ministerial duties); *State ex rel Beebe v McMillan,* 36 Nev 383, 388-389; 136 P 108 (1913) (by statute, the state insurance fund is a special fund and regarding disbursements, not subject to the requirements of approval by the Board of Examiners claims made against the state treasury are subject to); *State ex rel Stearns v Olson,* 43 ND 619, 625-626; 175 NW 714 (1919) (because the state treasurer has been designated custodian of the fund, the method for disbursing funds from the Workmen's Compensation Fund provided for by the Legislature, is for the Workmen's Compensation Bureau to direct the state treasurer to pay the claim and not the manner required for disbursement of state funds, i.e., a request to the state auditor); *Moran v State ex rel Derryberry,* n 35 *supra,* p 1286 (assets of the State Insurance Fund may not be appropriated for general purposes where the State Insurance Fund Act states explicitly that the fund will "operate and maintain in the same manner as privately owned insurance company" and "become neither more nor less than self-supporting"); *Chez v Industrial Comm of Utah,* n 35 *supra,* pp 452-453 (under a statute that includes language specifying that unneeded reserves will be returned to contributing employers, the State Insurance Fund is not public money).

them. Several common principles seem to govern the analysis: (1) whether the state has any liability beyond the assets of the fund;[1] (2) whether the assets of the fund are exclusively generated by premiums;[2] (3) whether the fund was intended to be run as a for-profit business;[3] and (4) a consideration of for what purposes the funds may be used.[4]

Applying these principles to Michigan's act, it is clear that: (1) the state has no liability beyond the assets of the fund;[5] (2) the assets of the fund are generated exclusively through premiums and the investment thereof;[6] (3) the fund was not originally intended to be run as a for-profit business; and (4) the assets of the fund are to be used exclusively to implement the policies underlying the worker's compensation act.

On review of decisions from our sister states, we conclude that the repeal by 1990 PA 157 of MCL 418.711; MSA 17.237(711), which provided that the fund shall be neither more nor less than self-sufficient, should not change the interest of the insured employers.

The fund was not intended by the Legislature of 1912 to be a for-profit business. It was intended to implement the worker's compensation act. The Legislature did not intend for the state to obtain a profit from operation of the fund, or gain by

---

[1] *Moran v State ex rel Derryberry*, 534 P2d 1282, 1286 (Okla, 1975).

[2] *Chez v Utah Industrial Comm*, 90 Utah 447, 449-451; 62 P2d 549 (1936).

[3] *Moran*, n 1 *supra* at 1286.

[4] *Chez*, n 2 *supra* at 449-451.

[5] See MCL 418.701(1); MSA 17.237(701)(1) ("The state shall not be liable or responsible for the payment of claims for compensation"), and MCL 418.725; MSA 17.237(725) ("neither the state nor the association is liable if the state accident fund is declared insolvent").

[6] See MCL 418.705; MSA 17.237(705), and MCL 418.746(1); MSA 17.237(746)(1).

reason of an unexpected windfall, at the expense of the premium-paying employers in a declared nonprofit business. It is also significant that the premiums collected by the fund are to be used exclusively for the purposes stated in MCL 418.746; MSA 17.237(746). Those named purposes include, among others, "[d]ividends and similar payments to policyholders."[7]

The assets of the State Accident Fund are held in trust for the insured employers.[8] They have a vested interest in the funds held in trust for their benefit. The insured employers were always, at least theoretically, "on the risk," while the state never had any risk. If those funds were squandered, they still must provide benefits to any employee who suffers a compensable injury. These vested rights may not be deprived without just compensation.

We conclude that 1993 PA 198, amending the worker's compensation act by adding MCL 417.701a; MSA 17.237(701a), providing that the consideration for the sale of the fund is the property of the State of Michigan, is unconstitutional because it violates US Const, Am V; Const 1963, art 10, § 2, and art 1, § 17.

---

[7] 1993 PA 198, amending the Worker's Compensation Act by adding § 701a, MCL 418.701a; MSA 17.237(701a), which provides that the consideration for the transfer of the assets of the State Accident Fund to a permitted transferee "shall be the property of the state of Michigan," is tie-barred to the repeal of § 746, MCL 418.746; MSA 17.237(746), and of other sections of the Worker's Compensation Act. Section 746 provides that the executive director of the State Accident Fund shall maintain a revolving fund derived from premiums collected from members of the fund, and that the revolving fund shall be used exclusively for among other purposes "[d]ividends and similar payments to policyholders."

[8] A vested right has been defined by this Court as "implying a vested interest which it is right and equitable that the government should recognize and protect, and of which the individual could not be deprived without injustice." *Wylie v City Comm,* 293 Mich 571, 587; 292 NW 668 (1940).

LEVIN, J., concurred with CAVANAGH, C.J.

RILEY, J., took no part in the decision of this case.